Harry Latter, et al. [1] v. Commissioner. Latter v. Commissioner
Docket Nos. 72245-72247.
United States Tax Court
T.C. Memo 1961-67; 1961 Tax Ct. Memo LEXIS 279; 20 T.C.M. (CCH) 336; T.C.M. (RIA) 61067; March 14, 1961
*279 Petitioner, owner of hotel property, paid the lessees a sum of money for cancellation of the lease and for certain improvements on the leasehold premises for the sole purpose of enabling him to enter into a new lease with a different tenant which lease provided for the making of extensive improvements on the leasehold premises by the petitioner. Held, the amount paid to the prior lessees is a capital expenditure to be amortized over the life of the new lease rather than the remaining unexpired term of the cancelled lease. Moise W. Dennery, Esq., Hibernia Bldg., New Orleans, La., for the petitioners. Jackson L. Bailey, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in the income tax of petitioners for the years 1952 and 1953 in the following amounts: Docket No.
Year
Deficiency
72245
1952
$23,101.46
72246
1953
10,255.00
72247
1952
23,101.46
The issue to be decided is whether the cost of acquiring a leasehold interest, including an amount representing the lessees' unamortized leasehold improvements, was properly amortized by the taxpayers over the remaining *280 life of the cancelled lease, or whether such costs should be amortized over the life of a new lease entered into by the taxpayer owners shortly after the cancellation of the prior lease. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. Petitioners are husband and wife and reside in New Orleans, Louisiana. For the calendar year 1952 petitioners filed separate income tax returns and for the calendar year 1953 a joint income tax return with the district director of internal revenue for the district of Louisiana at New Orleans, Louisiana. Petitioner, Harry Latter, hereinafter referred to as petitioner, is president of Latter and Blum, Inc., a large real estate firm in New Orleans, Louisiana. Petitioner has been engaged in the real estate business for forty-five years. Petitioner, on March 1, 1947, at a cost of $700,000 purchased the Bienville Hotel, 1040 St. Charles Avenue, New Orleans, Louisiana. The vendor of the property was Louisiana State University and Agricultural and Mechanical College. The Bienville Hotel was constructed in 1925 or 1926. At the time of the purchase of the Bienville Hotel it was being operated, under a ten-year lease *281 beginning January 24, Logan Management Company, Inc., had acquired the lease by assignment from Charles Reed, the original lessee. The lease of January 24, 1940, called for a minimum fixed rental of $30,000 per year, or 25 percent of the gross room rentals, whichever was the greater. On April 16, 1947, Shepard M. Latter and Shirley Latter Schlesinger, petitioners' son and daughter, purchased the lease from Logan Management Company, Inc. On October 1, 1948, petitioner as lessor, and his two children as lessees, entered into a lease extension agreement, extending the existing lease for an additional three years from April 1, 1950, to March 31, 1953, which agreement eliminated (a) certain options in the lease pertaining to renewal and (b) the right of the lessees to purchase the property. The gross income, expenses and net profit of the lessees of the Bienville Hotel arising out of the operation of the Bienville Hotel was as follows: Fiscal Year
Gross
Net
Ended
Income
Expenses
Profit
March 31, 1948
$637,363.64
$598,649.57
$38,714.07
(11 1/2 months)
March 31, 1949
640,001.31
550,474.28
89,527.03
March 31, 1950
609,771.48
538,809.19
70,962.29
*282 The gross rental, expenses and net income received by petitioners from the lease of the hotel property for the years 1947 through 1950 were as follows: Gross Lease
Year
Rental
Depreciation
Other Expenses
Net Income
1947
$ 33,912.70
$37,499.99
$ 2,932.45
($ 6,519.74)
1948
77,158.40
45,000.00
14,843.69
17,314.71
1949
118,035.96
36,710.02
20,640.01
60,685.93
1950
95,625.11
36,710.02
17,916.63
40,998.46
During the year 1949, announcements of the FHA-financed construction of six new apartment hotels in New Orleans were made, and came to the attention of taxpayers. During the years 1949 and 1950, construction began on the six apartment hotels as follows: No. of
Construction
Construction
Name
Rooms
Began
Completed
Claiborne Towers #1
518
June 1950
Dec. 1951
Claiborne Towers #2
518
July 1950
Feb. 1952
Orleanian
299
Nov. 1949
Jan. 1951
Mayflower
136
Aug. 1950
Mar. 1952
Georgian
164
Sept. 1950
Jan. 1952
Wohl
289
Nov. 1949
May 1951 Four of these six new apartment hotels were located within twelve blocks of the Bienville Hotel property. The Bienville Hotel was located between three-quarters *283 of a mile and one mile from the downtown business district of New Orleans. The occupancy rate of the Bienville Hotel, during 1947 and 1948, was 90 percent or better. Over 50 percent of the guests of the Bienville Hotel were permanent tenants rather than transients. During the latter part of 1949, there was a considerable drop in the occupancy rate of the Bienville Hotel. Gross room rentals in the Bienville Hotel were lower during the fiscal year ended March 31, 1950, by some $30,000 than they were during the previous fiscal year. There was a general drop in hotel occupancy in the year 1949 nationally. Taxpayers concluded in 1949 to attempt to sell the Bienville Hotel. Taxpayers concluded, at the same time that they determined to sell the Bienville Hotel, that it could not be sold subject to the lease then held by taxpayers' children. Taxpayers and their children informally agreed in 1949 to cancel the lease of the Bienville Hotel at such time as a sale of the property could be consummated. Because of the construction of the new and larger apartment house hotels in New Orleans, petitioner concluded that the hotel business in New Orleans would be very competitive. During the year 1950 *284 petitioner advertised the Bienville Hotel for sale in the Chicago Tribune and the New York Times. As a result of such advertisement petitioner received numerous inquiries concerning the property. Petitioner attempted to sell the property to the Pick Hotel Corporation and also to Julius Epstein, a hotel operator. These and the other serious attempts to sell the hotel property were unsuccessful. Petitioner learned by way of a newspaper article that Pan-Am Southern Corporation, hereinafter referred to as Pan-Am, was contemplating the construction of an office building in New Orleans. On August 14, 1950, petitioner wrote a letter to Pan-Am concerning the sale or lease of the hotel property. The letter states in part as follows: This will refer to our telephone conversation Thursday morning, whereby I discussed this property. I will either - (1). Convert this building into an office building and lease it to your company under a 20 year lease, at $1.90 per square foot, - we to pay taxes and insurance, - or (2). Sell this property to an insurance company, who will also advance funds for remodelling, and your company to take back a 25 or 30 year lease on the entire building. I am *285 willing to sell this property for $1,500,000. * * *
The distinctive factor in acquiring this building lies in the fact that we are not encumbered with any leases in the hotel, except the two small stores on the first floor occupied by Moore's Business Machines and a beauty parlor. We believe we could work out a plan to cancel these leases, if desired, so it would not interfere with a large store on that side of the lobby. We need hardly tell you about the desirability of this location, facing Lee Circle, with its clean surroundings and the fact that it will be within four blocks of the new Union Terminal Station. The building has very wonderful perpetual light from four sides, without the possibility of any interruption therefrom. We might also mention the fact that we had just had removed the large electric sign on the roof used by "Jax Beer", which contract had just terminated as we did not wish to renew this lease. The sign is so situated that it would have great advertising value because of the fact that the Bienville Hotel is a "head on" for St. Charles Avenue, and the "Jax" sign can be seen as far as Canal Street, coming up St. Charles Street. * * *
The writer *286 is the owner of this property and it would not necessitate any delay on any decisions. The work could be commenced for the remodelling within 90 days, for it should not take over this time to draw the plans for the remodelling. In order for petitioner to consummate any negotiations with Pan-Am, it was necessary that he acquire the leasehold interest of his children. Accordingly, on October 20, 1950, petitioner and his two children entered into an agreement cancelling the existing lease substantially on the same terms that they had agreed to informally in the year 1949. The cancellation agreement states as follows: THIS AGREEMENT made in the City of New Orleans, State of Louisiana on October 20, 1950, by and between Shepard M. Latter and Shirley Latter Schlesinger (hereinafter sometimes called "LESSEES") and Harry Latter (Hereinafter sometimes called "LESSOR"). * * *
WHEREAS the aforesaid lease does not expire according to its terms until March 31, 1953, And WHEREAS Harry Latter desires to obtain possession of the leased premises prior to the date of the expiration of said lease, And WHEREAS the said Shepard M. Latter and Shirley Latter Schlesinger are willing to *287 assign and transfer all their right, title and interest in their said existing lease of the Bienville Hotel Property for the sum of $60,000.00, but only provided the said Harry Latter also agrees to reimburse them at the book value of the unamortized balance of the leasehold assets as listed and recorded on the Bienville Hotel books at the time of closing as hereinafter set forth. NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS: * * *
3. The consideration to be paid by Lessor to Lessees is the book value at the time of closing of the unamortized balance of the leasehold assets plus the sum of $60,000.00; said book value to be determined by Barton, Pilie and Wermuth, Certified Public Accountants, which determination shall be accepted as conclusive by both Lessor and Lessees; said consideration to be paid in cash by Lessor to Lessees at the time of closing as herein provided. 4. The closing date shall be March 1, 1951 or prior thereto if required by Lessor. 5. The rentals payable by Lessees under the Extension of Lease contract dated October 1, 1948, and the rentals due to Lessees under the subleases hereinbefore described and referred to, shall be prorated as of the date *288 of closing, as herein provided. 6. Possession of the property herein agreed to be transferred and assigned shall be delivered by Lessees to Lessor at the time of closing. Petitioner and Pan-Am entered into a thirty-year lease of the hotel property on November 6, 1950, the lease to begin October 1, 1951. Petitioner agreed to: expend a sum of Six Hundred Thousand ($600,000) Dollars to pay for such alterations and/or remodeling and/or improvements to the building now situated on the leased premises as may be desired by Lessee, and according to plans and specifications of the Lessee, with the understanding that Lessee is to be responsible for and have sole discretion as to the work to be done. * * * In accordance with the understanding between petitioner and Pan-Am, the hotel property was converted into an office building. On February 27, 1951, petitioners paid their children $194,322.08, in accordance with the agreement of October 20, 1950. The payment was allocable to acquisition of the existing lease and leasehold improvements and equipment as follows: Cancellation of lease
$ 60,000.00
Leasehold improvements and
equipment
134,322.08
Total
$194,322.08
*289 The leasehold improvements and equipment with their book value at February 9, 1951, when they were acquired by petitioners were as follows: Intangible lease costs
$ 27,720.04
Restaurant equipment
1,701.69
Furniture
10,610.84
Carpets
21,031.91
Movable equipment
6,333.46
Fixed improvements
66,924.14
Total
$134,322.08
Petitioners sold fixtures acquired by them in the amount of $31,818.04 and used improvements with a cost of $23,762.06, leaving a remaining unrecovered cost of leasehold improvements and equipment of $78,741.98 and for cancellation of the lease $60,000, for a total amount of $138,741.98. In their returns for the years 1951 through 1953, petitioners amortized the cost of acquisition of the lease, leasehold improvements and equipment claiming deductions as follows: Year
Amount
1951
$58,698.53
1952
64,034.76
1953
16,008.69 [1]
In the statutory notice of deficiency for the year 1952 respondent made the following determination: It is determined that the amount of $80,043.45 *290 representing, at January 1, 1952, the unrecovered cost of acquiring a lease, should be amortized over the remaining life of a new lease entered into rather than over the remaining life of the lease acquired, and that therefore you are entitled to a community deduction for amortization for the year 1952 of $2,690.52 rather than $64,034.76 as claimed. In the statutory notice of deficiency for the year 1953, respondent made the following determination: It is determined that the amount of $80,043.45 representing, at January 1, 1952, the unrecovered cost of acquiring a lease, should be amortized over the remaining life of a new lease entered into rather than over the remaining life of the lease acquired, and that therefore you are entitled to a deduction for amortization for the year 1953 of $2,690.52 rather than $16,008.69 as claimed. Petitioner's sole reason for acquiring the lease of January 24, 1940, from his son and daughter was to enable him to enter into the new lease with Pan-Am. The cost of acquisition of the existing lease, including leasehold equipment and improvements, was part of the cost of obtaining the new long-term lease. The cost of acquisition of the lease and *291 leasehold equipment and improvements is recoverable over the term of the new lease and not over the unexpired term of the lease acquired. Opinion Petitioner contends that the acquisition of the old lease was contemplated and agreed upon in 1949 between the lessor and the lessees prior to and independently of the transaction creating the new lease with Pan-Am, that the lease arrangement with Pan-Am was merely the "catalyst" which made the prior agreement an actuality, and accordingly, concludes that the unrecovered costs in question are properly amortizable over the unexpired term of the canceled lease. ; . Respondent contends that petitioner's sole purpose in acquiring the old lease was to enable him to enter into the new lease with Pan-Am, and the cost of that acquisition must for that reason be considered a cost of acquiring the new lease, properly amortizable over its term. . We agree with the respondent. Generally, as stated in at page 542: *292 An amount paid by a lessor as consideration for the cancellation of a lease represents the cost to the lessor of acquiring a valuable property right, namely, the right to the possession, enjoyment and use of his property for the remaining unexpired term of the lease, and the cost of such a capital asset should be returned through deductions spread over the life of the asset, that is, the unexpired term of the canceled lease. * * * However, where the purpose of acquiring a lease is to enable the lessor to enter into a new lease, there seems to be some conflict as to whether the expenditure ought to be amortized over the unexpired term of the cancelled lease or over the term of the new lease. Cf. , reversed sub nom. (C.A. 9, 1947), and , with . An analogous problem has occurred where the remainderman of a trust acquires the interest of the life beneficiary. , *293 affd. (C.A. 6, 1960); (C.A. 7, 1954); see also, . In the instant case the petitioner's sole purpose in securing cancellation of the existing lease was to enable him to enter into the new lease with Pan-Am. Petitioner, when asked on cross examination: Q. Would you please tell the Court what other reason there was for the acquisition of the lease from your children other than for the purpose of entering into the lease with Pan Am Southern Corporation? A. You mean subsequently? Q. Yes. A. It had to be done in order to work out a lease. Q. In other words, that was your only purpose for acquisition of the children's lease was to enter - A. At that time, yes sir, yes sir. We wouldn't have cancelled it at that time. We talked about it when we were trying to sell the building, but that had to be accomplished. If the lease hadn't been cancelled, we couldn't have made the deal with Pan Am. Further, petitioner testified that the lease was not cancelled earlier because: A. I wanted to have some source of income without having a buyer for the property. We *294 talked about it any number of times because of what we considered the bad trend and I attempted to sell it, to make very desperate efforts to sell it. Thus, the old lease was to continue in effect until petitioner sold the property, or, as actually occurred, entered into a new and more favorable lease. Another factor to be considered is that the cancellation of the old lease not only returned to petitioner the possession and enjoyment of his premises, but also made it possible for him to make the extensive improvements of the hotel building, which the lease called for, up to the amount of $600,000. In principle the instant case is in listinguishable from those cases where various costs including demolition of old buildings are incurred solely to enable the lessor to enter into a new lease. M. & F. Holding Corporation and Business Real Estate Trust of Boston, both supra. Where the facts as here clearly indicate that the sole purpose in making the expenditures in question is to acquire a new lease, such costs are properly allocable to the new lease and are to be amortized over its term. *295 , and (where on the facts the taxpayer was held entitled to amortize the costs over the life of the new building rather than the new lease). . We hold that the costs incurred in acquiring the old lease, including the unrecovered costs of improvements in connection therewith, are properly amortizable over the term of the new lease entered into with Pan-Am. Decisions will be entered for the respondent. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Harry Latter and Anna S. Latter, Docket No. 72246; and Anna S. Latter, Docket No. 72247.↩
1. The figure of $16,000.69 set forth in the stipulation is in error: the return and the notice of deficiency set forth the figure of $16,008.69.↩